UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| LIBERTARIAN PARTY OF MAINE, et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | CV-08-288-B-W |
| MATTHEW DUNLAP, in his Official Capacity as Maine Secretary of State, | ) ) ) ) | |
| Defendant. | ) | |

**ORDER ON MOTIONS FOR SUMMARY JUDGMENT**

To appear on the November ballot, Maine law requires presidential candidates, who are not the nominees of a qualified political party, to submit their nomination petitions to municipal registrars for certification at least one week prior to the deadline for filing the petitions with the Secretary of State. The Plaintiffs are affiliated with the Libertarian Party and claim this requirement violates their constitutional rights. Because the Court concludes that the one-week-prior-to-filing deadline is not unduly burdensome on voters' rights and is justified by important state interests, the Court grants the State's Motion for Summary Judgment and denies the Plaintiffs' Motion for Summary Judgment.

I.      STATEMENT OF FACTS

On September 4, 2008, the Libertarian Party of Maine, the Libertarian National Committee, Inc., and seven individuals (Libertarians) filed suit for a declaratory judgment and injunctive relief against the Secretary of State for the state of Maine, claiming that 21-A

M.R.S.A. § 354(7)(B), the provision of Maine statutory law that required non-party candidates[1] to submit nomination petitions for certification to the municipal registrars by August 8, 2008 before filing them with the Secretary of State, and the Secretary's enforcement of that provision violated the United States Constitution.[2]  *Compl.* (Docket # 1).  The national Libertarian Party held its convention from May 22-26, 2008 in Denver, Colorado and nominated Bob Barr as its candidate for President of the United States and his running mate Wayne Root for Vice President.

Shortly after the national convention, the Party began to collect signatures to place Messrs. Barr and Root on the ballot for the fall elections, and to submit a slate of candidates for Presidential Electors.  Maine law requires non-party candidates to present 4,000 signatures in order to secure a place on the ballot.  21-A M.R.S.A. § 354(5).  Maine law further mandates that the signatures for presidential elector must be presented for certification to the municipal registrars by August 8, 2008, and that the certified petitions must be filed with the Secretary of State by August 15, 2008.  *Id.* § 354(7)(B) & (8-A).  On August 15, 2008, one week after the statutory deadline, the Libertarians presented approximately 5,700 signatures to the municipal registrars, and on instructions from the Secretary of State, the registrars refused to accept them as

---

[1] There is no accurate short-hand term to describe candidates subject to this provision of the law.  In general, they fall into two groups:  1) unenrolled candidates; and, 2) candidates affiliated with political parties not qualified to nominate their candidates by primary election.  The Libertarian Party of Maine fits under the second category.  Although the term "non-party" candidate is inaccurate, since the Libertarian Party of Maine is clearly a political party, the court follows the lead of the parties and refers to both groups as "non-party candidates."  Other alternatives, such as "non-qualified party," are awkward.

[2] The Plaintiffs are the Libertarian Party of Maine, the Maine affiliate of the national Libertarian Party; Bob Barr of Smyrna, Georgia, the Libertarian Party candidate in 2008 for President of the United States; Wayne Root of Henderson, Nevada, the Libertarian Party candidate in 2008 for Vice President; Clark Phinney of Winthrop, Maine, chairman of the Libertarian Party of Maine; Eric Buchak of Lagrange, Maine, Libertarian Party candidate in 2008 for Presidential Elector; Mark Cenci of North Yarmouth, Maine, Libertarian Party candidate in 2008 for Presidential Elector; Shawn Levasseur of Rockland, Maine, Libertarian Party candidate in 2008 for Presidential Elector; Susan Poulin of Casco, Maine, Libertarian Party candidate in 2008 for Presidential Elector; and, the Libertarian National Committee, Inc., headquartered in Washington, D.C. and the governing body for the national Libertarian Party.

untimely. As a consequence, neither Mr. Barr nor Mr. Root appeared on the presidential ballot in Maine for the fall 2008 election.

The Libertarians claim that the certification requirement and the Secretary of State's refusal to accept the petitions "unduly burden their rights to cast their votes effectively, to associate for the advancement of political beliefs, and to have due process and equal protection of law." *Compl.* ¶ 27. The Libertarians further contend that the state of Maine "has no state interest which makes it necessary to burden their rights." *Id.* The Libertarians filed suit under 42 U.S.C. § 1983, asserting that the statutory certification requirements amounted to a violation of their constitutional rights, including the rights to political association, to an effective vote, to due process, to equal protection, and to create and develop a new political party. The Libertarians seek a judicial declaration that the August 8 deadline and the Secretary of State's refusal to grant them access to the November 2008 ballot are unconstitutional. They seek injunctions against the enforcement of the August 8 deadline and against the Secretary of State's actions. After completing discovery on March 31, 2009, both the Libertarians and the State filed dueling motions for summary judgment. *Def.'s Mot. for Summ. J.* (Docket # 11) (*Def.'s Mot.*); *Pls.' Mot. for Summ. J.* (Docket # 14) (*Pls.' Mot.*).

## II. DISCUSSION

### A. Maine Election Law

#### 1. Presidential Candidates Who are Unenrolled or Who are Affiliated with a Political Party not Qualified to Participate in Primary Elections

Under Maine statute, candidates who are unenrolled or who are affiliated with a political party that is not qualified to participate in primary elections in Maine can qualify to have their names printed on the general election ballot through the nomination by petition process. 21-A

M.R.S.A. §§ 351-57. Candidates for President who use this process are required to circulate nomination petitions for a slate of presidential electors.[3] *Id*. at § 354(1)(B). The petitions may be circulated anytime after January 1 of the election year. *Id*. at § 354(6). For the candidate to qualify, completed petitions must contain at least 4,000 signatures, and must be filed with the Secretary of State with the candidate's written consent by August 15 of the election year. *Id*. at § 354(5)(A) & (8-A).

Voter registration is handled at the municipal level in Maine. *Id*. at §§ 121, 122, 161, 172. The registrar of voters is required to certify that the signatures on the nomination petition are registered voters within the municipality, and the statute stipulates that the nomination petition must be submitted to the municipal registrars for certification by 5:00 p.m. on August 8 of the election year. *Id*. at § 354(7)(B). The certified petition must be filed with the Secretary of State by 5:00 p.m. on August 15. *Id*. at § 354 (8-A). If the petition is in order, the Secretary of State "shall accept" it and the name of the candidate appears on the general election ballot. *Id*. at § 356(1).

### 2. Presidential Candidates for Qualified Political Parties

Maine law provides a different mechanism for placing the nominees of qualified political parties on the general ballot for President. There is "no primary election in Maine for candidates for President, Vice President, or Presidential elector." *Anderson v. Quinn*, 495 F. Supp. 730, 733 n.7 (D. Me. 1980). Instead, party recognition allows for "automatic listing of the party's presidential candidate on the election ballot." *Libertarian Party of Me. v. Diamond*, 992 F.2d 365, 367 (1st Cir. 1993). Qualified political parties are "not required to certify their Presidential and Vice Presidential candidates to the Secretary of State by any particular date." *Quinn*, 495 F.

---

[3] The Court generally refers to candidates for President of the United States; the reference encompasses candidates for the Vice Presidency.

Supp. at 732 n.5. Similarly, presidential electors are not subject to the primary process in Maine. 21-A M.R.S.A. § 331(2)(A). The process for qualified political parties recognizes that their candidates for national political office are nominated through a series of primaries throughout the country, leading to their nominating conventions. On the other hand, the statute sets up requirements for a political party to qualify. *Id*. at § 301. For example, its candidate for President (or Governor) must have received at least 5% of the total vote cast in the state for President (or Governor) in either of the two preceding general elections. *Id*. at § 301(1)(C).

### 3. Qualified Party Candidates for Offices Other than President

Maine law has another process for candidates for a qualified party's nomination for Governor, United States Senator, Representative to Congress, State Senator, State Representative, County Commissioner, or other county offices. *Id*. at § 335(5). A nomination petition "may not be signed before January 1 of the election year in which it is to be used." *Id.* at § 335(6). The names on the petition must be certified by the municipal registrar, *id*. at § 355(7)(B), and "filed with the office of the Secretary of State before 5:00 p.m. on March 15th of the year in which it is to be used." *Id*. at § 335(8). There is no requirement that the names on the petition must be submitted to the municipal registrars at least one week before the filing date with the Secretary of State.

### B. Mootness

Although the Libertarians filed suit on September 4, 2008, they failed to press the matter before the fall elections. They argue that the issues in this case have not been eclipsed by the elections, since they are of significant public interest and could arise again in the future. *Pls.' Mot.* at 4-5. The Court agrees.[4] *See Storer v. Brown*, 415 U.S. 724, 737 n.8 (1974) (addressing an election issue since the question was "capable of repetition, but evading review"); *New*

---

[4] The State has not claimed that the Libertarians' claims have been rendered moot by the fall election.

*Hampshire Right to Life PAC v. Gardner*, 99 F.3d 8, 18 (1st Cir. 1992) (describing such challenges as an exception to the mootness doctrine).

### C. Legal Standards

In *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983) and *Burdick v. Takushi*, 504 U.S. 428, 433-34 (1992), the United States Supreme Court established a balancing test to evaluate challenges to state ballot access requirements:

> A court considering a challenge to a state election law must weigh the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate against the precise interests put forth by the State as justifications for the burden imposed by its rule, taking into consideration the extent to which those interests make it necessary to burden the plaintiff's rights.

*Burdick*, 504 U.S. at 434 (citation and internal punctuation omitted). The required analysis differentiates between regulations that impose "severe" restrictions and those that impose only "reasonable, nondiscriminatory" restrictions on voters' rights. *Id.* For "severe" restrictions, the regulation must be "narrowly drawn to advance a state interest of compelling importance." *Id.* (quoting *Norman v. Reed*, 502 U.S. 279, 289 (1992)). For "reasonable, nondiscriminatory restrictions," the "State's important regulatory interests are generally sufficient to justify the restrictions." *Id.* (citation and internal punctuation omitted). The *Anderson-Burdick* balancing test represents a judicial attempt to arrive at an "equilibrium between the legitimate constitutional interests of the States in conducting fair and orderly elections and the First Amendment rights of voters and candidates." *Libertarian Party of Me.*, 992 F.2d at 370.

### D. Application of the *Anderson-Burdick* Balancing Test

#### 1. Restrictions on Voters' Rights

The Libertarians contend that 21-A M.R.S.A. § 354(7)(B) violates non-party candidates' rights to equal protection by requiring that "non-party nomination petitions be delivered to the

municipal registrars for certification a week in advance of filing them with the Secretary of State" whereas "no such statutory requirement applies to petitions for party candidates seeking access to the ballot in primary elections." *Pls.' Opp'n to Def.'s Mot. for Summ. J.* at 3 (Docket # 21) (*Pls. Opp'n.*). This alleged injury boils down to the different treatment of party and non-party candidates: Party candidates are afforded the opportunity to deliver "some or all of their petitions to the registrars during the one-week period prior to the deadline for filing them with the Secretary," whereas this same flexibility is denied to non-party candidates. *Id*. at 4.

Although the Libertarians argue that their experience illustrates how "unwelcome circumstances can delay the collection of petition signatures," they do not enunciate any circumstances not of their own creation. *Id*. at 4-5 (stating that the party had only five weeks to collect signatures because *the Libertarians* had not fully selected presidential candidates and electors until July 2) (emphasis added).[5]

The Libertarians assert that future non-party candidates might be "unable to gain access to the ballot for lack of a few extra days," *id*. at 4, but this complaint holds true for any enforced deadline. The Libertarians cannot mean that all state-imposed election deadline requirements are unconstitutional. Clearly, they are not. More to the point, the Libertarians provide no reason that a deadline of August 8—as opposed to some other date—is by itself particularly burdensome.

        **a.    A Week Pre-filing Deadline by which Non-party Presidential Candidates must Submit Signatures to Registrars for Certification is not an Undue Burden**

---

[5] The Court is in no way critical of the Libertarian Party's timing of its national convention. Presumably, the Libertarian Party weighed multiple factors in selecting the dates. The point is only that whatever date the Libertarian Party chose, it was its decision and the Party is in an awkward position to complain that its decision shortened the time within which it could collect signatures.

Maine's ballot access requirements for non-party candidates are not burdensome. Non-party presidential candidates have between January 1 and August 8 of an election year, nearly seven and one-half months, to gather the required signatures for gaining ballot access. 21-A M.R.S.A. § 354(6) & (7)(B). This burden is further minimized by the low-number of certified signatures non-party candidates must submit. Four thousand signatures represents less than 1% of all registered Maine voters and less than 1% of all Maine votes cast in the 2006 gubernatorial and 2004 presidential elections. Additionally, Maine imposes very few restrictions on the petition process. For example, Maine does not limit who can collect signatures; Maine voters – both registered and non-registered – can collect, but so can out-of-state voters. Any registered Maine voter may sign a petition, including those enrolled in a qualified-party, and may sign multiple petitions in one year. *Id.* at § 354(2). Finally, the August 8 deadline is just shy of 90 days before Election Day, well-after the June primary elections for qualified-party non-presidential candidates and during the run-up to the qualified-party conventions for president.[6]

The Supreme Court has upheld state requirements on non-party candidates' access to ballots much more burdensome than Maine laws.[7] In *Jenness v. Fortson*, 403 U.S. 431, 433 (1971), the Supreme Court considered Georgia's election laws, which allowed non-party candidate ballot access by filing a petition with signatures of at least 5% of eligible voters. The non-party candidate had 180 days to collect the requisite number of signatures and the petition

---

[6] The timing of the primary election and conventions in relation to the filing deadline for non-party candidates' signature petitions is significant because non-party candidates can gain significant support from party members displeased with their party's candidates. *Anderson v. Celebrezze*, 460 U.S. at 790-91. Here, the Libertarians have a point, since in 2008, the Democratic and Republican parties did not hold their conventions until late August and early September in 2008. The timing was abnormally late. At the same time, the presidential political season for 2008 started early and by mid-summer 2008, the potential choices had considerably narrowed.

[7] A survey of lower court decisions leads to the same conclusion. *See, e.g., Barr v. Ireland,* 575 F. Supp. 2d 747 (S.D.W.Va. 2008) (August 1 filing deadline and 2% signature requirement); *Council of Alternative Political Parties v. Hooks*, 179 F.3d 64, 77-78 (3rd Cir. 1999) (June deadline, by the date of the state's primary); *Coalition for Free & Open Elections v. McElderry*, 48 F.3d 493, 498 (10th Cir. 1995) (July 15 petition deadline for presidential electors of non-recognized parties, 3% signature requirement); *Rainbow Coalition of Oklahoma v. Oklahoma State Election Bd.*, 844 F.2d 740, 747 (10th Cir. 1988) (May 31 deadline for electors of recognized parties, 55 days in advance of primary election, 5% signature requirement).

had to be "filed on the second Wednesday in June, the same deadline that a candidate filing in a party primary must meet." *Id*. at 433-34.  The Court concluded that it could "find in this system nothing that abridges the rights of free speech and association secured by the First and Fourteenth Amendments." *Id*. at 440.  In *Storer*, the Court resolved that an election law giving non-party candidates 24 days to collect signatures from 5% of the total votes cast in California at the last general election "d[id] not appear to be excessive," 415 U.S. at 738, even though signatures would have had to have been collected "at the rate of 13,542 per day." *Id*. at 740 (remanding to assess whether the signature requirement, coupled with restrictions disqualifying voters who participated in a qualified-party primary from signing, effectively made the signature requirement too burdensome).

Only election laws far more demanding of non-party candidates than Maine laws are found too burdensome.[8]  In *Celebrezze*, the Supreme Court struck down Ohio election laws that imposed on non-party candidates a March 20 filing deadline for completed signature petitions, 75 days before the June primary and four to five months before the qualified parties decided their candidates.  460 U.S. at 782.  The difference in burden between an August 15 and an August 8 filing deadline is simply not comparable to the burden from a filing deadline 5 months earlier.

This conclusion is underscored by the fact that non-party candidates have qualified under these same Maine election laws seven different times in the past. *See, e.g.*, *Burdick*, 504 U.S. at 436 (finding election laws at issue not burdensome in part because of the success of nonpartisan candidates in obtaining slots on the ballot in past years); *Jenness*, 403 U.S. at 439 (finding

---

[8] A survey of lower court decisions leads to this same conclusion. *See, e.g.*, *Nader v. Brewer*, 531 F.3d 1028 (9th Cir. 2008), *cert. pet. pending* (striking down an Arizona deadline that was 90 days before presidential primary election and 146 days before general election and 3% signature requirement); *Libertarian Party of Ohio v. Blackwell*, 462 F.3d 579, 582 (6th Cir. 2006) (striking down Ohio deadline for non-party candidates 120 days before March presidential primary, meaning an entire year prior to election); *Lee v. Keith*, 463 F.3d 763, 768 (7th Cir. 2006) (striking down Illinois deadline for non-party candidates 92 days before March party primaries, meaning in December of the year prior to election year and 10% signature requirement).

corroboration for its conclusion that election laws at issue were not burdensome because several non-party candidates in the past had gained ballot access through signature petitions). In fact, in the November 2008 election, a non-party candidate, Ralph Nader, was successful in submitting the requisite signatures by August 8 to qualify for the presidential ballot.

> **b.  A Week Pre-filing Deadline is not Unduly Burdensome on Non-party Presidential Candidates Relative to Qualified-Party Candidates**

A state can impose "different routes to the printed ballot" for new and smaller political organizations than it does for established political parties. *Jenness*, 403 U.S. at 442 (holding that "[t]here is surely an important state interest in requiring some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot"). By uniformly treating qualified-party and non-party presidential candidates differently, Maine has done just that. In presidential elections, a qualified-party is assured of having the name of its nominee—the winner at the party convention—printed on the ballot. Neither party nor candidate needs to submit certified signatures at any point in the process. 21-A M.R.S.A. §§ 301(2), 331(2)(A). Non-party presidential candidates, on the other hand, must submit certified signatures to the Secretary of State by August 15 to gain ballot access. *Id*. at §§ 351-57. These separate processes appropriately reflect the differences in the two types of candidates. S*ee also Williams v. Rhodes*, 393 U.S. 23 (1968) (striking down Ohio election laws in part because the laws burdened small and new political organizations with the same elaborate statewide party structure as established parties).

Although the Libertarians have stressed Maine's disparate treatment of qualified-party candidates for non-presidential office and non-party candidates for presidential office, the critical comparison is between "candidates for the same office, not with candidates for other offices who

10

are elected through a different process." *Quinn*, 495 F. Supp. at 733. Whether qualified-party candidates for non-presidential office need to submit signed petitions to local registrars by a specific deadline does not reflect on the burdens of non-party *presidential* candidates.

Even making the comparison that the Libertarians suggest, the processes for nominating qualified-party non-presidential candidates and non-party presidential candidates differ significantly. Qualified-party non-presidential candidates must file signatures with the state to be included on the primary ballot, the winner of which is then listed on the general election ballots in November. By contrast, non-party candidates who submit the requisite signatures gain direct access to the general election ballot. Compare 21-A M.R.S.A. § 335(5) with §§ 353, 354. Qualified-party candidates have only 8 weeks, from January 1 to March 15, to collect and certify the necessary signatures; non-party presidential candidates have five more months. Qualified-party candidates need only collect 2,000 signatures; non-party presidential candidates must submit 4,000.[9] Compare *id*. at § 335(8) & (5) with § 354(7)(B) & (5)(A). Despite accepting these differences, the Libertarians focus on one similarity, certification of signatures by municipal registrars, and complain that the requirement is not parallel for qualified-party and non-party presidential candidates. The schemes' marked dissimilarities make comparisons of isolated elements unconvincing.

Finally, the State argues that a deadline for submitting signatures to local registrars for certification may be advantageous to the non-party candidates. It points out that absent a deadline, qualified-party candidates take responsibility for the chance that registrars might not review and certify signatures in time. Instead of burdening non-party candidates, the State concludes that "having a statutory deadline…may, in fact, increase the chances of obtaining

---

[9] January 1 to March 15 is in the dead of the Maine winter. Extending the period to August 8 for non-party candidates is a decided practical advantage.

timely review by the registrars." *Def.' Opp'n to Pls.' Mot. for Summ. J.* at 6 (Docket #18). The Court is not in a position to assess the merits of the State's contention, but observes that even a direct comparison of the differing requirements does not necessarily lead to the Libertairans' conclusion.

Because the week pre-filing deadline is not unduly burdensome on non-party candidates, strict scrutiny under the *Anderson-Burdick* test does not apply. The State need only provide an "important regulatory interest[]" in the August 8 deadline for it to be upheld. *Norman*, 502 U.S. at 289.

### 2. Maine's Interest in Regulation

Maine has set forth important regulatory justifications for the August 8 filing deadline. First, local registrars need a week to ensure accurate certification by August 15. Second, the August 15 deadline barely allows the State enough time for challenges to nominated candidates and for the printing and provision of absentee ballots so that absentee voters can vote by Election Day.

The August 8 deadline ensures that local registrars have sufficient time to certify signatures before non-party candidates must file petitions with the Secretary of State. Certification requires that signatures be reviewed to validate that each signature belongs to a registered voter. Because voter registration is administered at the local level, local registrars must perform this time-consuming task. Many town offices are "not open every day of the week" and "others are open for less than a full 8-hour day." *Def.'s Mot.* at 12. The seven-day-window allotted by Maine is a reasonable amount of time to complete this important regulatory objective.

12

Further, the August 15 deadline is the last possible date such petitions can be received by the State and still gives Maine absentee voters' time to return ballots by Election Day. In its filings, the State has described in detail the complicated and time-consuming ballot printing process: The staff of the Elections Division of the Secretary of State's office designs all general election ballots, approximately 660 different ballot styles, which are then given to an independent printer who must "print, wrap, label and ship all ballots to approximately 550 separate electoral jurisdictions across the state." *Id*. In addition, each municipal office must receive ballots far enough before Election Day to send out absentee ballots "well in advance of the general election—45 days ahead under federal guidelines and 30 days ahead by state law." *Id*. at 13. Such advance receipt enables Maine voters unable to get to the polls to cast absentee ballots before the close of Election Day. The State attests that "the Elections Division staff needs to know which candidates' name are to appear on the ballot no later than 11 weeks ahead of the election" to ensure that ballots can be printed and sent to absentee voters in time. *Id*.

The possibility for challenges to the validity of the nomination petitions adds to this administrative time. Maine voters have five days after the deadline for filing non-party petitions with the Secretary of State to challenge the nomination petition for a slate of presidential electors. 21-A M.R.S.A. § 356(2)(A). A hearing on the challenge is held within seven days, and the Secretary of State in turn must issue a decision within five days. *Id.* at § 356(2)(B) & (C). That opinion can be appealed to the Maine Superior Court and to the Maine Law Court, with specific time frames on decisions to resolve the case within 40 days from the Secretary of State's decision. *Id.* at §§ 356(2)(D) & (E).

The State must leave time for challenges that by statute could push back ballot printing by at least 57 days. For example, a 2004 challenge to the nomination of Ralph Nader and Matt

Gonzalez was not resolved until October 8.  *Melanson v. Secretary of State*, 2004 ME 127, 861 A.2d 641.  The State had less than four weeks to print and send absentee ballots, jeopardizing the ability of Maine citizens overseas to cast votes by Election Day.  Maine's August 8 deadline is as generous as the State can afford to be while still discharging its election related duties.

Given the low burden on voters' rights, Maine's reasons for imposing a deadline on non-party candidates for signature certification a week prior to the August 15 filing deadline are sufficiently important.  The Court finds that 21-A M.R.S.A. § 354(7)(B) easily passes the *Anderson- Burdick* test and is constitutional.

### III.     CONCLUSION

The Court ORDERS that the Defendant's Motion for Summary Judgment (Docket # 11) is hereby GRANTED.  The Court further ORDERS that the Plaintiffs' Motion for Summary Judgment (Docket # 14) is hereby DENIED.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 16th day of September, 2009